BANCROFT

*v.*

BANCROFT, ET AL.

(Court of Chancery of Delaware.  New Castle.  Aug. 25, 1905.)

*Thomas F. Bayard,* for complainant. *William S. Hilles,* for respondents.

NICHOLSON, Chancellor: The bill in this cause was filed on the 29th day of May, 1905, and a restraining order granted pending the hearing and determination of the motion for a preliminary injunction, which was argued at Dover on the 7th day of June, 1905, upon bill, answers, affidavits, and exhibits; one additional affidavit having been presented by the complainant on the 10th day of June.

The complainant alleges in paragraphs 5 and 6 of his bill as follows, viz.:

"(5) That on or about the 28th day of September, A.D. 1889, one William P. Bancroft, and Emma C., his wife, and your orator, Samuel Bancroft, Jr., and Mary R., his wife, did grant and convey unto the mayor and council of the city of Wilmington, New Castle county, and state of Delaware, aforesaid, a certain plot or parcel of land, for a valuable consideration and for the purposes mentioned in the deed of conveyance; said deed being recorded in the office of the recorder of deeds in and for New Castle county, in Deed Record U, vol. 14, p. 229, et seq., to which your orator begs leave to refer, and prays that it may be taken as a part of this, his bill.

"(6) That on or about the 28th day of September, A.D. 1889, a certain plot or parcel of land in New Castle county aforesaid was granted and conveyed unto the mayor and council of Wilmington, New Castle county, and state of Delaware, by one William P. Bancroft and Emma C., his wife, for a valuable consideration, and for the purposes mentioned in the deed of conveyance; said deed being recorded in the office of the recorder of deeds in and for New Castle

county, in Deed Record V, vol. 14, p. 52, et seq., to which deed your orator begs leave to refer, and asks that it may be taken as part of this, his bill."

It is further alleged that the said board of park commissioners, on or about the 26th day of April, 1905, formulated a certain agreement, license, or contract in writing, in the name of the mayor and council of Wilmington, granting unto the People's Railway Company the right and privilege to place and operate a portion of their line of railway in, over, and upon portions of the two parcels of land referred to in paragraphs 5 and 6, above quoted, and by resolution did approve the same; that thereafter Charles D. Bird, as mayor of the city of Wilmington, and the said the People's Railway Company, duly executed this agreement, and in accordance with its terms the said the People's Railway Company did, with the permission of the board of park commissioners, begin the construction and placing of the equipment of its said line of railway in, over, and upon the said two parcels of land. Complainant then alleges that, "as one of the grantors of the parcel of land mentioned in paragraph 5 of the bill, the installation and placing and operating of the said line of railway would be in violation of the terms of the conveyance by which the mayor and council of Wilmington became seised of the said parcel of land"; and finally, in paragraphs 17 and 18 of the bill, he alleges that he is a resident, citizen, and taxpayer of the city of Wilmington, and as such liable for his proportionate share of the taxes levied for the purpose of keeping up the public park system, and that it would be detrimental and injurious to him as a taxpayer as aforesaid, if the said People's Railway Company is allowed to place, install, and operate its line of railway upon either or both of the said parcels of land mentioned in paragraphs 5 and 6 of this bill. Copies of the conveyances referred to in paragraphs 5 and 6 were presented at the hearing of the motion for a preliminary injunction, and the terms of the conveyance described in paragraph 5, which the complainant alleges would be violated by the installation and operating of the proposed railway, appear in the habendum of the deed, which quoted in full is as follows: "To have and to hold the said tract of land, hereditaments, and premises hereby granted or mentioned, or intended

so to be, with the appurtenances, unto the said the mayor and council of Wilmington, its successors and assigns, to the only proper use and behoof of the said the mayor and council of Wilmington, its successors and assigns, forever, for the sole use and purpose of a public park, subject, however, to the following restrictions and limitations, viz.: That said Rockford lane shall forever hereafter remain open as a public highway at the width the same now is, unless the said lane shall be vacated or closed by and with the consent of the owners of the water power of the Brandywine at Rockford, their heirs, executors, administrators, or assigns." Upon the above grounds the complainant prays for a preliminary injunction restraining all the respondents "from taking any further action whatsoever under or in pursuance of the terms of the agreement, license, or contract" above described.

In response to this the respondents in their several answers allege that "the only portion of the lands included in the grant referred to in the fifth paragraph of the said bill, which it is contemplated shall be used for railway purposes, comprises a certain public road, known as 'Rockford Road,' and that the said railway will not at any point or points cross or touch the said lands mentioned in the said paragraph of the said bill, excepting along the said public road." And the answer of the People's Railway Company, respondent, also alleges "that the said conveyance in the said paragraph recited was made to and accepted by the said the mayor and council of Wilmington, subject to the right of all persons to use the said public highway in all particulars proper for a public road or street in the city of Wilmington and state of Delaware."

The route of the proposed railway through the park, connecting tracks of the People's Railway Company south of the park with portions of its track, lately built north of the park, is fully set forth in its answer, with accompanying maps; and it is alleged that, owing to the location of the track in unused portions of the park, and the conditions under which the railway is to be operated according to the agreement above referred to, it will be a benefit, instead of a detriment, to the park, as well as of use to the public generally, by rendering the park accessible to many who otherwise would be unable to enjoy it. The question, however, of the expediency or desirability of a railway

located and operated in the park in the manner described is not before me; nor is there any question raised in this case with regard to the power of the mayor and council of Wilmington to grant such a license or enter into such an agreement as the one under consideration, so far as it concerns the portions of the park other than the parcels of land conveyed by the deeds referred to in paragraphs 5 and 6 of the bill. All of the questions raised by the pleadings relate strictly to the parcels of land conveyed by the aforesaid deeds, and the complainant's case is based entirely upon the terms of the deeds above cited; his claim being that the license or grant to the People's Railway Company is in contravention of the terms of the said deeds or conveyances, and that the locating and operating of a railway under it would be a diversion of the land granted to a use other than that of a public park. Although the respondent's counsel combats this contention, arguing, on the one hand, that there is statutory authority for such action on the part of the board of commissioners in other parts of the park, which applies to the parcels of land granted by the conveyances referred to, notwithstanding their terms, and, on the other hand, claiming that the license or grant to the railway company is not in contravention of the terms of those deeds, that it is not inconsistent with the use of the land for the sole use and purpose of a public park, yet he rests his defense principally upon the grounds which I will now proceed to consider.

In the first place, with regard to the parcel of land referred to in paragraph 6 of the bill—that is, the land granted to the mayor and council of Wilmington by William P. Bancroft, and Emma C., his wife—the complainant claims the right to ask the intervention of a court of equity solely upon the ground that he is a resident citizen and taxpayer of the city of Wilmington, as is alleged in the seventeenth and eighteenth paragraphs of the bill, which I have recited above. The respondent's counsel, however, insists that the complainant has no standing in court in this case merely as resident citizen and taxpayer; it having been so held with regard to this class of cases by the overwhelming weight of authority. He cites the case of *Biggs v. Buckingham et al.,* 6 *Del.Ch.* 267, 23 *Atl.* 858, in this state, and refers to volume 10, *Enc. Pl. & Prac.* pp. 897-901, for a very exten-

sive, if not complete, collection of the authorities throughout the Union upon this subject. This question has been so much discussed, and the authorities are so overwhelmingly in favor of the contention of respondent's counsel, that it is not necessary for me to analyze or discuss the cases. I will only quote from one late case, especially referred to by the respondent's solicitor, viz., *Manson et al. v. South Bend Railroad Company et al.,* 41 *S.E.* 832, decided by the Supreme Court of South Carolina in 1902. The syllabus is as follows: "Residents of a city, whose interest in a public park differs only in degree from that of the other residents of the city, and whose property does not abut on the park, cannot sue to enjoin its condemnation for a railroad station." And the court says, *inter alia*:

"The question under consideration is so conclusively settled bv the case of *Cherry v. City of Rock Hill,* 48 *S.C.* 553, 26 *S.E.* 798, that the court might, with propriety, rest its decision on that authority. We will, however, cite others. The rule in such cases is thus stated in *High, Inj.* 1298, 1301:

" 'Sec. 1298. The question of the degree of interest in the subject-matter which is requisite to render one a proper party plaintiff to institute an action for the purpose of restraining misconduct on the part of municipal corporations or their officers is one of much practical importance and deserving of special attention. In general, it may be said that, to warrant the interference of equity in this class of cases, the aggrieved party must show that some special and peculiar injury, personal to himself, is likely to result from the act complained of, aside from the general injury to the public. And while some conflict of authority exists as to what constitutes such special injury as will warrant a court of equity in interfering, the better doctrine is that taxpayers of a municipal corporation, as a city or county, whose burdens of taxation are increased by the misappropriation of public funds by municipal officers, or by other official misconduct on the part of such officers, sustain such special damage as to entitle them to relief. Thus, the enforcement of a city ordinance which is unconstitutional and void, and which seeks to impose a debt upon the city, may be enjoined by property owners and taxpayers of the city. So, where a board of county commissioners are proceeding without au-

thority of law to appropriate county funds in aid of the construction of a railway, a taxpayer of the county has such an interest in the public funds as enables him to maintain a bill for an injunction. And since the municipal government of a city or town is intrusted with the control and disposition of municipal affairs for the benefit and protection of its citizens and taxpayers, they are the proper parties to a bill for an injunction against the improper exercise of a municipal authority.'

" 'Sec. 1301. Although the general doctrine that taxpayers are proper parties to invoke equitable relief against misconduct upon the part of municipal authorities is thus seen to be well established, it is not to be understood that they are entitled to maintain an action in all cases of this nature, regardless of their personal interest, or of the degree of injury which they may sustain. And where, under a general power in a city charter to establish and regulate markets, the corporate authorities of the city are about to remove a market house, taxpayers, as such, have no sufficient ground for enjoining the removal, whatever may be the rights of adjacent proprietors and others injuriously affected thereby. So a taxpayer in a city, who files a bill in behalf of himself and other taxpayers to enjoin the city from selling a public park or square, is not entitled to the relief, when he has no land abutting upon the square, and when he has no private interest involved other than or different from the body of taxpayers.' "

Every case cited by complainant's counsel at the argument or in his brief was brought either by a grantor or an abutter, nor have I been able to find a single case in which the right of a taxpayer and citizen to bring such a suit as this merely as citizen and taxpayer has been sustained. This eliminates from the case before me the consideration of any question connected with the proposed use of the land conveyed by William P. Bancroft and wife alone, and leaves only that of the parcel of land in the conveyance of which the complainant joined as grantor, referred to in paragraph 5 of the bill.

It is not denied by the complainant that the only portion of that parcel of land upon which the line of railway is proposed to be constructed is what is known as "Rockford Lane or Road"; but in reply

to the allegation, made in the answers of both respondents and supported by a number of affidavits, that the said lane or road is and has been for over 20 years a public road, the complainant filed a long affidavit in rebuttal. In this affidavit the complainant states that he was born in 1840 within 400 yards of the property mentioned, and that he has lived ever since within a quarter of a mile of the same, and "that to his own personal knowledge all that portion of Rockford lane involved in this action was, up to the time of the deed mentioned in paragraph 5 of the bill, a private road leading from near Church lane on the south to a point where the Rockford lane passes out of the park system of the city of Wilmington, as described in paragraph 5." He follows this general statement with such an explicit description and history in detail of this road or lane and its uses as to leave no doubt in my mind as to the correctness of his conclusions, and no counter affidavit or statement has been filed or presented in reply to it.

Granting, however, that it is clearly established by the complainant that the said Rockford lane was not a public highway prior to the date of the conveyance referred to in paragraph 5, yet there appears in the habendum of that conveyance, which was quoted above in full, the following clause, coming immediately after the words "for the sole use and purpose of a public park," viz.: "Subject, however, to the following restriction and limitation, viz., that said Rockford lane shall forever hereafter remain open as a public highway at the width the same now is, unless the said lane shall be vacated or closed by and with the consent of the owners of the water power of the Brandywine at Rockford, their heirs, executors, administrators, or assigns." Does not this clause grant the said Rockford road or lane for the use of a public highway, rather than that of a public park, thereby sustaining the following allegation in the answer of the People's Railway Company, viz.: "And this defendant further says that the said conveyance in the said paragraph recited was made to and accepted by the mayor and council of Wilmington, subject to the right of all persons to use the said public highway in all particulars proper for a public road or a street in the city of Wilmington?" When the complainant granted this land to the mayor and council of the city of Wilmington "for the sole use and purpose of a public park, subject, however, to the follow-

ing restrictions and limitations, viz., that said Rockford lane shall forever hereafter remain open as a public highway at the width the same now is," also limiting the municipality's power to vacate it by adding, "unless the said lane shall be vacated or closed by and with the consent of the owners of the water power of the Brandywine at Rockford, their heirs," etc., he excepted Rockford lane from the prior limitation to the uses and purposes of a public park, so that it became a public highway as soon as the mayor and council of the city of Wilmington accepted the grant.

I am unable to read any other meaning into these words. They seem to be apt words of dedication, with no ambiguity or uncertainty about them, and it of course follows that the said Rockford lane, or so much of it as was included within the grant, became subject at once to use and occupation by street railways in the same manner and to the same extent as any other highway within the limits of the city of Wilmington—became so by virtue of the grant of the complainant and its acceptance by the city. It is manifest, therefore, that upon the case presented the motion for a preliminary injunction must be denied.

Let the order be entered accordingly.